USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _12/18/07_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————x

IN RE TOP TANKERS, INC.
SECURITIES LITIGATION,

06 Civ. 13761 (CM)

————————————————————————x

## DECISION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS THE CORRECTED AND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

McMahon, J.:

Before the Court is defendants' motion to dismiss the "corrected and amended" consolidated complaint in this securities fraud class action lawsuit. For the reasons set forth below, the motion is denied.

### Proceedings Prior to the Filing of the Challenged Pleading

This consolidated action comprises ten underlying class action lawsuits, all of the them filed in the Southern District of New York within weeks after the defendant corporation -- Top Tankers, Inc. -- announced that it was restating its earnings for the first two calendar quarters of 2006. The restatement was occasioned by a change in the accounting treatment for a "seller's credit" associated with thirteen sale and leaseback transactions that Top Tankers entered into during the first two quarters of 2006. This court consolidated all the actions by order dated July 30, 2007. (Dkt. #68.)

Like all securities fraud class actions filed since the passage of the Private Securities Litigation Reform Act (PSLRA), this case saw considerable action prior to what would be, in most cases, the opening salvo – the instant motion to dismiss the complaint.

Numerous motions for lead plaintiff status were filed in the ninety days following the filing of the first Top Tankers complaint on December 5, 2006. (Dkt. #1.) Most of the motions were withdrawn prior to the court's rendering a decision on July 30, 2007. In that decision, this court, overruling the recommendation of the magistrate judge, selected Joseph A. DeShayes, Jr., individually and on behalf of his wife, daughter and son-in-law, and his business, as lead plaintiff. (Dkt. #68.)

The court set August 17, 2007 as the date for the filing of a consolidated class action

1

complaint, and such a pleading was in fact filed. (Dkt. #70.)  The August 17 pleading was rife with allegations about self-dealing by Top Tankers' President and Chief Executive Officer, defendant Evangelos Pistiolis, and members of his family and inner circle; about the allegedly wrongful payment of a substantial dividend to all Top Tankers shareholders in March 2006 (which purportedly was designed to benefit Pistiolis and his associates by effectively withdrawing much of the capital they had invested in the company without diluting their shareholdings); and about the bona fides and business wisdom of the sale-leaseback transactions that were allegedly entered into to permit the payment of that dividend.  Interspersed among those allegations were charges that Top Tankers had improperly accounted for 10% of the $550 million due to it in connection with the sale and leaseback of 13 of its vessels – an error that, when corrected, resulted in a restatement of earnings, for the first two quarters of 2006, of one cent and seven cents, respectively.

On September 20, 2007, defendants moved to dismiss the consolidated complaint. (Dkt. #76.)  Two weeks later, on October 2, plaintiffs filed an unopposed motion to "correct" and "amend" their pleading by deleting what plaintiff describes, in his Brief in Opposition to this motion, as some "minor factual errors." (Dkt. #81; Pl. Opp. Mem. (Dkt. #99) at 3 n.2.)  In fact, the corrected and amended consolidated complaint was about half the length of its predecessor. It eliminated *all* the allegations about self-dealing by Pistiolis and his family and friends, and all claims concerning the impropriety of the dividend— basically, all the allegations that suggested some motive for fraudulent conduct on defendants' part.  And while it retained the charge that the 2006 sale-leaseback transactions had been a financial disaster for Top Tankers (in a section that had previously been titled "The *Disastrous* Aftermath of Defendants' Fraudulent Scheme," but that was retitled "The *Troubling* Aftermath of Defendants' Fraudulent Scheme"), no claims for relief were predicated on that poor business decision. That is not surprising, since plaintiffs admit that the cause of the "disaster" was a change in the spot market for charter-in rates, not any misconduct (as opposed to misjudgment) by defendants.

All that remains in this lawsuit, then, is the claimed accounting impropriety, which resulted in the modest earnings restatement described above.

Defendants have now moved to dismiss the corrected and amended pleading. They argue principally that plaintiff has failed to plead facts giving rise to a strong inference of scienter as required by the PSLRA— interpreted, most recently, by the United States Supreme Court in Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499 (2007). In particular, defendants claim that the accounting treatment used to account for the "seller's credit" during the first two quarters was initially blessed by the company's outside auditors, Ernst & Young LLP (E&Y), thereby negating any inference of scienter, let alone a strong inference.

**The Allegations of the Corrected and Amended Complaint**

Top Tankers provides international seaborne transportation services for refined petroleum

products and crude oil. As of December 31, 2006, the company's fleet consisted of 24 vessels. (29.)[1]

On March 13, 2006, the first day of the class period, Top Tankers announced that it was selling 13 of its vessels and immediately leasing them back for a period of five or seven years. (32.) The leases were "bareboat charters," which allowed the company to remain responsible for the operation and management of the vessels, including the expenses associated with their operation (the "charter-hire" rates). (33.) At the same time, Top Tankers announced that it intended to distribute approximately $210 million of the $550 million in proceeds it expected to receive from the sale to its shareholder, in the form of a Special Dividend. (32, 74.) The Special Dividend, totaling $7.50 per share, was in fact paid to the company's shareholders in March and April 2006.

The $550 million purchase price included a provision known as a "seller's credit," whereby 10% of the sale price ($55 million) was retained by the buyer/lessor as security for the rent Top Tankers was paying to lease the vessels back. (34.) The seller's credit was not to be paid to Top Tankers until the end of the lease period (five or seven years, depending on the vessel), after the company had fulfilled all its financial obligations under the leases. (Id.) The seller's credit was, in effect, contingent income – contingent on Top Tanker's paying what it owed for leasing the vessels. Both Pistiolis and defendant Stamatis Tsantanis, the company's Chief Financial Officer, made public statements indicating that they were aware that top Tankers would not collect the seller's credit until the lease periods ended. (51, 52.)

Nonetheless, the company's March 13 announcement included a statement that it expected to realize a book gain of approximately $90 million, to be amortized over the lease period. (32, 76.) That amount (ultimately $96 million, which amortized to $82 million present value) admittedly included the $55 million seller's credit. (36, 37, 83.)[2]

On May 11, the company announced income of $30.404 million for the first quarter ($1.06 per share) on operating income of over $38 million— an increase of 37 cents per share over the prior year. (82.)

On June 27, 2006 – the same day the company filed a Form 6-K for June 2006 announcing the sale of 2.6 million shares in "at-the-market" transactions – the company filed a supplemental prospectus pursuant to Rule 424(b)(2). (114.) This document included what the pleading describes as a "partially corrective disclosure," which was actually an announcement that the SEC was commencing an informal investigation into all of the company's acquisitions

---

[1] The parentheticals refer to numbered paragraphs in the Corrected and Amended Consolidated Complaint.

[2] The total book gain was amortized over the entire lease period, which reduced its present value to $82 million. (36)

3

going back to 2004, including the March 2006 sale-leaseback transaction, as well as into the $7.50 special dividend. Prior to that filing, the company's stock opened at a price of $7.45 per share; the day after the filing, it closed at $6.43 per share. (Id.)

On August 3, the company announced a net loss of $4.911 million, (equivalent to a per share loss of $0.17), on operating income of $89,000— a decrease of $0.30 per share over the prior year. (87.)

On November 29, 2006, Top Tankers announced that it was changing its accounting for the seller's credit by subtracting the $55 million from total book gain, and that it would be restating its first and second quarter earnings as a result. (48, 102, 116.) The changes appear small— first quarter earnings were reduced by one cent per share and second quarter earnings by seven cents per share. (48, 116.) However, the transaction occurred with only two weeks to go in the first quarter, and in the company's November 29 announcement it revealed that the present value of the seller's credit was included in the first quarter earnings only "in part." (102.) The second quarter restatement was sufficient to transform operating income for the second quarter of $89,000 into an operating loss of $1,640,000. (49, 116.)[3] It also resulted in a 30% increase in the loss per share for that quarter (from $0.17 to $0.26). (Id.)

At the same time, Top Tankers made the somewhat more ominous announcement that E&Y had resigned as the company's outside auditor. (55.)

During a subsequent (December 7) analyst conference call, Pistiolis explained that E&Y had reviewed the company's first and second quarter financials before they were released, and had issued a comfort letter in connection with the company's first quarter reported earnings. (43.) However, according to Pistiolis, E&Y later concluded that the seller's credit should be treated as a "residual value guarantee," rather than as book gain. In a series of meetings with E&Y representatives in Athens and New York, Top Tankers and E&Y tried and failed to convince each other of their respective positions. (Id.) Top Tankers then approached the Securities and Exchange Commission staff to obtain the SEC's view, which led to further disagreement between defendant and E&Y concerning the content of that submission. Top Tankers eventually acceded to E&Y's suggestion that the accounting treatment be changed and earnings restated for the two earlier quarters; it withdrew its request for an opinion from the SEC. Nonetheless, E&Y decided to resign. (Id.)

At the time of its resignation, E&Y was in discussions with Top Tankers' Audit Committee concerning third quarter earnings and certain points of difference had not been

---

[3] The pleading also claims that each succeeding quarter would have had to be restated to the tune of seven cents per share if Top Tankers had persisted in its accounting treatment for the seller's credit. (48.) But it did not. This allegation about "what might have been" (found in the corrected and amended complaint at paragraph 50) is clearly superfluous and is irrelevant to the instant motion.

resolved. (55.) Top Tankers announced that its Audit Committee had engaged outside counsel to look into these matters. (43.)

Pistiolis attributed E&Y's decision to a breakdown in relations between auditor and client. (43.) E&Y has never publicly disclosed the reason for its resignation as the company's auditors – which plaintiff alleges violates SEC regulations found at 17 CFR 229.304(a)(3). (44.)

The company's stock closed 14% lower on the day of this announcement, following what plaintiff describes as unusually heavy trading. (58, 116.)

The pleading at issue contains an extended (eleven paragraph) discussion of what a poor business decision the sale-leaseback turned out to be, noting that various analysts and publications blamed the decline in Top Tankers' earnings on the fact that the charter-in rates it had agreed to pay were proving high in light of a drop in the spot market price for similar charters. (60-70.) As noted above. none of that has the slightest relevance to the actual allegations of wrongdoing that are brought against defendants and I do not consider those allegations in deciding this motion.

**The Stock Price During the Class Period**

The defendants have submitted to the court a complete compendium of the opening, high, low and closing prices of Top Tankers common stock during the class period, which supplements the rudimentary price information contained in the pleading. (Ex. C to the Decl. of Justina L. Geraci, dated October 17, 2007.) The Court takes judicial notice of these prices.

On March 13, 2006, the stock opened at $16.09 and closed at $16.66. It rose as high as $18.32 on March 22, which was immediately before payment of about two-thirds of the Special Dividend (the dividend was paid in two tranches, on March 25 and April 25). The stock price then proceeded to drop on an almost daily basis, so that a month later, on April 21 (one month after the earnings were allegedly inflated, and just before payment of the remainder of the Special Dividend), it opened at $7.90 and reached a high of just $8.04.The stock traded consistently at between $6 and $8 per share, albeit always trending downward, for the next two and one half months. It lost 20% of its value after the so-called "partially corrective disclosure" of the SEC investigation on June 27; it never regained that value.

From mid-July until November 29, the last day of the class period, the stock traded in a narrow range of values centering around $6 per share. On November 28, the stock reached a high of $6 and closed at $5.86. It opened the next morning at $4.85    a drop of approximately 21% – and rose slightly during the day, closing at 5.04 on a volume of 2,671,100 shares (the aforementioned 14% decline).

Prior to November 29, the stock had last traded at over a million shares on August 3, so it

is fair to say that the volume was heavy on the last day of the class period— the day the earnings restatement and E&Y's resignation were announced.

## What the Corrected and Amended Complaint Does Not Allege

The pleading presently before the court does not allege that the Pistiolis interests or any other insiders sold stock at a profit during the period when Top Tankers' earnings were allegedly inflated, or that they otherwise had any financial or other motive to commit fraud.

It also does not specifically allege that E&Y in fact approved the accounting treatment of the seller's credit in the company's first and second quarter financial statements. (See below for a fuller discussion of this point.)

## Standards on A PSLRA Motion to Dismiss

The plaintiff concedes that the only issue germane to this motion to dismiss is whether it has adequately alleged facts "giving rise to a strong inference" of scienter, or fraudulent intent. 15 U.S.C. § 78u-4(b)(2).

The only truly relevant case for assessing the viability of the scienter allegations in the corrected and amended complaint is Tellabs, the Supreme Court's most recent pronouncement about what a complaint must plead in order to survive such a motion.

In Tellabs, the class action complaint alleged that the company made a series of false statements about revenue and about the demand for the company's most popular products. When the company revealed that its projections were inaccurate, the share price dropped and lawsuits inevitably followed. The Supreme Court, reversing the Seventh Circuit, remanded the case because the courts below did not consider whether the facts alleged in the pleading gave rise to a "strong" inference of scienter, rather than a "plausible" inference of scienter. In the relevant addition to PSLRA jurisprudence, the Supreme Court announced that the "strength of inference" inquiry was "inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?" Tellabs, 127 S. Ct. at 2510. District courts faced with PSLRA motions to dismiss were told to consider "plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." Id. We were further instructed that a complaint adequately pleaded scienter (that is, the inference of scienter could be deemed "strong") only if a reasonable person would deem the inference of scienter both "cogent" and "at least as likely as any plausible opposing inference." Id. at 2504-06, 2513.

The Tellabs decision also emphasizes that the inquiry is to be made in the context of a traditional motion to dismiss   assuming the well-pleaded facts of the complaint to be true   and that all the facts alleged, taken collectively, must be considered in deciding whether the pleading

6

gives rise to a strong inference of scienter. Seizing on the "at least as likely" language, courts since Tellabs have concluded that even if the plaintiff demonstrates only that an inference of scienter is at least as compelling as any nonculpable explanation for the defendant's conduct, the "tie . . . goes to the plaintiff." *See, e.g.,* Sloman v. Presstek, Inc., 2007 U.S. Dist. LEXIS 69475, at *24-25 (D.N.H. Sept. 18, 2007).

## Disposition of the Motion

Applying Tellabs' "cogent and at least as likely as any competing inference" definition of "strong" to the corrected and amended consolidated complaint before this court constrains me -- in a very close case -- to deny the motion.

In this Circuit, a plaintiff may plead a strong inference of scienter by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or that show the defendants had both the motive and the opportunity to commit the fraud. Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994). As noted above, the corrected and amended complaint does not allege any facts tending to show that the defendants had any motive to understate Top Tankers' earnings by one cent in the first quarter and seven cents in the second quarter of 2006. All such allegations were deleted from the original consolidated class action complaint as part of plaintiff's elimination of "certain minor factual errors" from the pleading. (Pl. Opp. Mem. (Dkt. #99) at 3 n.2.)

As a result, plaintiff concedes that he is not relying on the "motive and opportunity" prong of Shields. Instead, he argues that the allegations of the complaint constitute strong circumstantial evidence of recklessness on the part of defendants in their accounting treatment of the seller's credit, as reflected in their earnings statements for the first two quarters of 2006. (Pl. Opp. Mem. (Dkt. #99) at 10-11.) To be precise, plaintiff argues that a strong inference of scienter is raised by his allegation that defendants knew of facts, or had access to information, suggesting that their public statements were inaccurate. For the proposition that this is sufficient, he cites a pre-Tellabs case from this Circuit, Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000).

In Novak, defendants allegedly knew that they were violating the company's internal inventory control policies. By contrast, in the corrected and amended complaint, the allegations suggesting that defendants were reckless in including the seller's credit in its first and second quarter earnings are much more general. They are three in number:[4] (1) Pistiolis and Tsantanis knew that the company would not be receiving the funds represented by the seller's credit until the end of the lease periods, and then only if Top Tankers fulfilled all its obligations under the leases; (2) certain Generally Accepted Accounting Principles (GAAP) required that this contingent future income not be included in book gain up front, but instead be deferred until it

---

[4] I have drawn these from the corrected and amended complaint, including especially the section entitled "Additional Scienter Allegations" (90-96.)

was actually realized. In support of the second proposition, the pleading contains an extensive section that discusses allegedly relevant GAAP principles and identifies the accounting principles on which plaintiff relies (see especially paragraphs 100-101 of the corrected and amended complaint); and (3) at some unidentified point in time, E&Y took issue with the company's decision to include the seller's credit in its total book gain, and eventually resigned as the company's auditor despite Top Tankers' decision to restate its earnings.

Clearly, after Tellabs, any inference of Novak scienter to be drawn from these allegations of fact must be both "cogent" and "at least as compelling" as any non-culpable inference that defendant suggests could be drawn from the facts. If the inference plaintiff asks the court to draw is at least as compelling as the inference defendant asks the court to draw (i.e., in case of a tie), the complaint will not be dismissed.

The first question to be answered is whether the inference plaintiff asks the court to draw from the facts pleaded – namely, that defendants were reckless in choosing to recognize this contingent future income as part of the total book gain – is "cogent," which means "compelling or convincing." BLACK'S LAW DICTIONARY 252 (7th ed. 1999).

Clearly much of what plaintiff pleads does not give rise to a cogent inference of scienter in and of itself. For example, defendants are correct that knowledge of the GAAP accounting principles cited by plaintiff at paragraphs 100 & 101 cannot be attributed to the individual defendants simply because of their positions at the company. In re NTL Inc. Sec. Litig., 347 F. Supp. 2d 15, 33 (S.D.N.Y. 2004); In re Advanta Corp. Sec. Litig., 180 F.3d 525, 539 (3d Cir. 1999). Defendants are also correct that neither the mere fact of the earnings restatement nor the purportedly inaccurate Sarbanes-Oxley ("SOX") certification gives rise to support a strong inference that they were reckless in their original computation of first and second quarter earnings. In re BISYS Sec. Litig., 397 F. Supp. 2d 430, 447-48 (S.D.N.Y. 2005); Garfield v. NDC Health Corp., 466 F.3d 1255, 1265-66 (11th Cir. 2006). And defendants correctly note that the general allegation that, "knowledge of the accounting improprieties may be imputed to the company's officers and directors who are involved in the day-to-day operations of the company" does not give rise to any inference of scienter.

But the pleading does not limit itself to these inadequate allegations.

Insofar as GAAP accouting issues are concerned, the complaint pleads Pistiolis' own account of a series of discussions with E&Y, which necessarily occurred sometime during the class period, and which concerned the accounting treatment of the seller's credit. During these discussions, E&Y, by Pistiolis' admission, apprised Top Tankers that the seller's credit should not have been included in book value, but should be treated as a "residual value guarantee."[5] So

---

[5] This acknowledgement of E&Y's position by Pistiolis is important. Defendants asserted to this court in their Reply Brief in support of the motion that the relevance of the GAAP principle cited by plaintiff in paragraphs 100-101 of the corrected and amended complaint was

the pleading contains allegations that defendants well knew, not just as a result of their positions, but from their independent auditors, about allegedly proper accounting principles.

Similarly, the fact of an earnings restatement does not inexorably point to a failure of proper accounting controls. However, plaintiff – again relying on words out of Pistiolis' mouth – pleads that E&Y resigned over disputes with Top Tankers concerning accounting practices, and did so notwithstanding the client's ultimate acquiescence in its recommendation that earnings be restated. If true, this admits of an inference that there was some deficiency in Top Tankers' internal controls, which makes the SOX certifications more important.

Thus, plaintiff pleads facts tending to show that, at some point during the class period, E&Y told Top Tankers that the seller's credit was a residual value guarantee and that, under GAAP, residual value guarantees were not to be recognized up front. Plaintiff also pleads that if the seller's credit were more properly described as contingent income, that, too, is not usually reflected up front, because that would result in recognizing revenue prior to its realization. (98 & n.1.) If the particular accounting procedures pleaded by plaintiff are indeed the correct ones to apply to the seller's credit, it would tend to show that for some period of time prior to the time when the earnings were restated (though not necessarily the entire alleged class period), Pistiolis and Tsantanis were aware that the company was improperly accounting for the seller's credit. These well-pleaded facts support an inference of scienter.

Of course, it would be easier to draw the inference of scienter that plaintiff would have the court draw at this stage if the complaint contained some allegation about precisely when the dispute between E&Y and Top Tankers over accounting for the seller's credit arose. It does not. If E&Y raised the issue only a week or two before the earnings were restated, the existence of the dispute would be far less suggestive of scienter than if the dispute between client and accountant raged for three or four months. But I reject the idea that plaintiff needs to plead when the dispute arose in order to plead scienter successfully. Information about the dealings between accountant and client is uniquely in the hands of the defendant and E&Y, which, consistent with its confidentiality obligations to its client, is unlikely to provide the plaintiff and his counsel with information absent a subpoena.

In deciding whether the inference plaintiff would have me draw is "compelling," the court is also hampered by the fact that E&Y has never publicly disclosed the reasons for its resignation. Contrary to plaintiff's contention, there is no reason why it should have done so, because defendants are not in violation of SEC regulations relating to change-of-auditor letters. Top

---

incorrect, since Top Tankers had not guaranteed the residual value of the vessels. (Defs.' Reply Mem. (Dkt. #102) at 4-5.) However, whether residual value guarantee treatment is or is not appropriate appears to have been the essence of the dispute between client and auditor over the proper accounting treatment for the seller's credit; it is not some self-evident proposition, as defendants suggest.

Tankers is a foreign private issuer, and foreign private issuers are not subject to SEC Regulation S-K, and more particularly to Item 304 of Regulation S-K regarding changes in auditors. The American Institute of Certified Public Accountants (AICPA) – specifically, the International Practices Task Force of the AICPA's SEC Regulations Committee – has expressly opined that Item 304 letters are not required of foreign private issuers.[6] Therefore, I cannot infer bad faith from the fact that E&Y has not been asked to file such a letter.

Ultimately, the issue is whether the dispute between Top Tankers and E&Y concerning the accounting treatment of the seller's credit was a legitimate accounting dispute— legitimate meaning that each side had crafted a defensible accounting position out of GAAP. Defendants may well have had such a legitimate position. However, they need to assert it by way of a defense. The court cannot assume that such a position exists. The facts pleaded admit of a cogent inference of scienter – no more than cogent, and perhaps just barely cogent, but at least cogent.

The next question is whether the inference is at least as compelling as any competing non-culpable inference defendant would have me draw. The answer to that question is yes.

Defendants would have me infer that they relied on E&Y's approval of the accounting treatment they used in the first two quarters. They argue that this reliance precludes any inference – let alone a strong inference – of scienter on their part.

Because this is a motion to dismiss, factual allegations giving rise to this inference must appear on the face of the complaint.

Unfortunately for defendants, the corrected and amended complaint nowhere alleges that E&Y approved the accounting treatment for the seller's credit in Top Tankers' first and second quarter financials.

I have searched the pleading to see whether such approval can be inferred from the totality of its allegations. The complaint does not admit of that inference.

Insofar as the corrected and amended consolidated complaint contains factual allegations concerning E&Y's attitude toward the seller's credit, they are found in a single paragraph, which consists of a lengthy quotation from an analyst conference call conducted by Pistiolis on December 7, 2006 – a week after the November 29 announcement. (43.) In that call, Pistiolis explained in greater detail defendants' view of the reasons for E&Y's resignation. This explanation revealed, among other things, that Top Tankers had consulted with E&Y about at least one aspect of the accounting treatment for the sale-leaseback transaction (the amortization of book gain over the term of the leases), that E&Y had reviewed the first and second quarter

---

[6] *See* AICPA International Practices Task Force Meeting Highlights, May 3, 2001, at XIV, *available at* http://thecaq.aicpa.org/Resources/SEC+Regulations+Committee/SEC+Regulations+Committee+Highlights+-+May+2001.htm .

financials before they were released, and that E&Y had given Top Tankers a "comfort letter" for the first quarter in connection with a consult equity offering the company was conducting at the time. (Id.)

The "comfort letter" is not part of the record – it certainly is not appended to or relied on in the complaint · and I have no idea what it does or does not say, or what one could fairly imply from its contents about E&Y's attitude toward the accounting treatment for the seller's credit. I do note, however, that the sale-leaseback took place at the very end of the first quarter; from this, one could reasonably infer that the impact of the accounting treatment for the seller's credit on first quarter earnings would be negligible.[7] Furthermore, the company's November 29 restatement announcement indicated that the present value of the seller's credit was included only "in part" in the first quarter financials, but was included "in full" in the interim unaudited financial statements for the second quarter. (102.) This not only ameliorates any inference of "comfort" concerning the accounting treatment for the seller's credit that one could draw from Pistiolis' reference to a "comfort letter," it also fairly suggests that the accounting treatment for the seller's credit differed in the first and the second quarters, which would make any comfort letter addressed to first quarter earnings meaningless as to second quarter earnings.

Nor is there any information in Pistiolis' statement about whether E&Y's "review" of the first and second quarter financials (which were, of course, not audited) resulted in the auditor's raising any question with the company about the company's immediate recognition of the seller's credit, or whether that issue arose only after September 30, when the third quarter financials were under review. We know from Pistiolis' statement that there were "a number of conversations and communications with E&Y in Athens and the United States" about the subject, "in which E&Y could not convince us that their position was correct and we could not convince them that our position was correct." (43.) Pistiolis also revealed that the company made an abortive approach to the SEC in an effort to enlist support for its position. (Id.) Since discussions and approaches to the SEC take time, one can reasonably infer that E&Y did not first raise the issue of accounting for the seller's credit with Top Tankers in the days immediately preceding the November 29 earnings restatement. However, one cannot infer how long before that announcement the accounting dispute arose.[8]

In short, on the subject of E&Y's alleged approval of the original accounting treatment for the seller's credit, the pleading contains a self-serving statement by defendants (which the pleading specifically identifies as "*the Company's position* on the sequence of events leading up to E&Y's resignation" (emphasis added)). Moreover, the statement does not address, directly or indirectly, whether E&Y specifically approved the accounting treatment for the seller's credit

---

[7] And we know from the allegations of the complaint that it was negligible— one cent on announced earnings of $.07, or less than 1% impact.

[8] The appropriate date for the start of the class period – and the value of this lawsuit to plaintiffs and to counsel   may well be impacted by how the facts play out concerning this issue.

prior to the announcement of the company's first and second quarter results, only to reverse itself later, as defendants would have me conclude.

If this were a motion for summary judgment, and there were undisputed evidence that E&Y had in fact not raised any issue about the treatment of the seller's credit at the time the first and second quarter financials were issued – and only later changed its opinion – the defendant would win the case. Such evidence (which, if it exists, can be obtained with about two depositions) would negate any inference of Novak scienter. But there is no such evidence in the record at present.

Nor could there be, because this is not a motion for summary judgment. It is a motion to dismiss. Tellabs and the Supreme Court's other recent incursion into dismissal motions (Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955 (2007)) notwithstanding, it remains the case that at this point in the lawsuit, the court may not "weigh the evidence that might be presented at trial," but must instead limit itself to considering all of the facts alleged in the complaint, taken collectively. In re Converium Holding AG Sec. Litig., 2007 U.S. Dist. LEXIS 67660 at *8-9 (quoting Chosun Int'l, Inc. v. Chrisha Creations, Ltd., 413 F.3d 324, 327 (2d Cir. 2005) (citation omitted)). I cannot say that the inference defendants would have me draw is supported by the facts that are alleged in the complaint.

This court well understands Congress's desire to protect corporations from strike suits. However, the issue in this case is a particularly narrow one. By conducting just three or four depositions of key witnesses, it will be possible to ascertain, within the next month, whether or not the smoke that plaintiff has identified – E&Y's strangely-timed resignation – means that there really was fire at Top Tankers. Quick and targeted discovery is the fastest and most efficient way to manage and dispose of this particular case. And that is how I am going to manage and dispose of it.

The motion to dismiss is denied.

By the end of January, plaintiffs should obtain from defendants and E&Y, as third party witness, the following: (1) all documents and correspondence (defined in the usual way), internal and between themselves, concerning the accounting treatment for the seller's credit, generated at any point from March 13, 2006 to November 29, 2006; and (2) deposition testimony from no more than four witnesses who took part in the discussions that led to the restatement and/or to E&Y's resignation. No other discovery should be necessary or will be permitted. If E&Y did not resign over the accounting treatment for the seller's credit, then this case will be readily disposed of on a motion for summary judgment. There will be no fishing expedition during discovery beyond the matters that are specifically placed at issue in the corrected and amended complaint.

This constitutes the decision and order of the court.

Dated: December 18, 2007

_____
                                    U.S.D.J.

BY ECF TO ALL COUNSEL